UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


PATRICIA ALCORN,

          Plaintiff,                   Case No.  06-13046

v.                                District Judge Bernard A.  Friedman
                                Magistrate Judge R.  Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

          Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff  Patricia Alcorn brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).  For the reasons that follow, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On February 15, 2001, Plaintiff filed an application for Disability Insurance Benefits (DIB), alleging an onset date of September 15, 1996 (Tr. 52).  After the Social Security Administration (SSA) denied benefits on August 9, 2001, she made a timely request for an

administrative hearing, held on December 6, 2002 in Flint, Michigan (Tr. 48). Plaintiff, represented by Darrin Andrus, testified before Administrative Law Judge (ALJ) Douglas Jones on December 6, 2002 (Tr. 320). Vocational Expert (VE) Stephanee Leech also testified (Tr. 45, 353-360). On January 24, 2003, ALJ Jones determined that Plaintiff was not disabled (Tr. 19). On January 18, 2005, the Appeals Council vacated the decision and remanded the case back to the Administrative Judge level in order to give consideration to the nonexamining source opinion; further evaluate claimant's mental impairments; further consider claimant's residual functional capacity; and obtain supplemental evidence from a vocational expert (Tr. 19, 253).

Plaintiff then testified before ALJ John A. Ransom in Flint, Michigan, on June 21, 2005 (Tr. 19, 25, 320-353). Plaintiff, represented by attorney Mike L. Lupisella, amended her disability onset date to August 15, 1999 (Tr. 19, 364). VE Timothy Shaner also testified (Tr. 364, 369-373). On December 7, 2005, ALJ Ransom found Plaintiff not disabled, retaining the ability to perform a significant range of sedentary work at the semi-skilled level (Tr. 25). On June 10, 2006, the Appeals Council denied review (Tr. 6). Plaintiff filed for judicial review of the final decision on July 3, 2006.

## BACKGROUND FACTS

Plaintiff, born April 23, 1957, was age 48 when ALJ Ransom issued his decision (Tr. 52). She had completed the 11th grade and worked as a medical records clerk (Tr. 20, 77-78). Plaintiff alleges disability due to an injured disc in her neck; severe headaches; shoulder pains; and arthritis in the neck, hands and shoulders (Tr. 68).

## A. Plaintiff's Testimony

### 1. Testimony to ALJ Jones

Plaintiff testified as follows:

Plaintiff completed the 11th grade and began working at Saginaw General Hospital in medical records (Tr. 323-324). The hospital did not require her to obtain a GED (Tr. 323). She had not worked for almost six years prior to the hearing (Tr. 324).

Plaintiff had a driver's license, but did not drive very often or very far (Tr. 326). Driving caused so much pain that it occasionally forced her to stop and vomit (Tr. 326-327). The pain increased during driving as she was cautious about driving while medicated (Tr. 327). She drove a short distance about once a month, but had driven less once her husband was able to drive again (Tr. 327).

As a medical records clerk, Plaintiff lifted up to about 60 pounds and spent most of the day on her feet, sitting only a maximum of two hours (Tr. 328). Plaintiff found it difficult to keep up with the pace at work as her medication put her in a "fog" and turning a certain way would cause pains (Tr. 329). She developed instant migraines and reported a great deal of pain from lifting and filing (Tr. 329). When she became tired, one of her feet would drop (Tr. 329). She attributed the migraines to a pituitary tumor (Tr. 329-330). It was unclear to her whether the tumor had gotten worse, however, her Cortisone treatments had activated the tumor again and triggered early menopause (Tr. 330). The tumor caused lactation, headaches, nausea, vision problems, hot flashes, exhaustion, moodiness, and weight fluctuations of 25 to 30 pounds (Tr. 330).

Plaintiff still suffered from headaches, although the medication helped (Tr. 331). She took Fioricet and Darvocet together for the pain and headaches, but would also take Phenergan if the migraine was severe enough to make her nauseous (Tr. 331). Phenergan made her drowsy (Tr. 331). If she had a bad headache, she would lie down in a dark room (Tr. 331). Migraines severe enough to cause nausea occurred about once every ten days and would last all day, sometimes longer (Tr. 331). Stress and certain smells triggered the migraines (Tr. 332).

Plaintiff could not move quickly, turn her head, or keep her head in a fixed position for long periods of time (Tr. 333). Having to hold her head in a fixed position usually caused pain within 10 minutes (Tr. 333). The pain would originate at the back of her neck and spread into her shoulders (Tr. 334). Pain would also develop around her ear, into her eye and forehead (Tr. 334). Her shoulders would also become swollen, preventing her from performing overhead work (Tr. 334).

Plaintiff was told by doctors that her headaches were caused by the disk herniation and the pituitary tumor (Tr. 335). She did not finish the series of Cortisone blocks that she underwent in 1996 due to the side effects from the medication (Tr. 335). She attributed the drastic weight loss to the Cortisone (Tr. 335).

Plaintiff's neck felt stiff and the exercises she was told to perform resulted in no improvement (Tr. 335). The exercises hurt due to all the turning and movement, creating knots in her shoulders and hurting her neck (Tr. 336). Although she had previously performed the exercises every day, she reduced the frequency to once every four to five days

because of the pain associated with it (Tr. 336). The exercises took about 10 minutes to perform (Tr. 336).

Plaintiff was told by Dr. Schell that she was a good candidate for surgery, although he did not put it in the report (Tr. 336). Dr. Schell told her that if her foot started to drop more, she would need surgery or risk crippling the foot (Tr. 336). However, she elected not to have surgery due to her husband's bad experience with surgery and no guarantee of success (Tr. 336). Both feet would drop, although it was usually her right foot (Tr. 337). She could not remember which foot dropped while she was working, although she suspected it was her left foot (Tr. 337). Both sides were almost equally affected (Tr. 337-338).

Plaintiff's arm strength had diminished (Tr. 338). She had bad wrists and problems with her biceps and triceps (Tr. 338). Pain radiated down her hands, depending on whether there was humid, damp, or cold weather (Tr. 338). The arthritis in her hands caused her knuckles to enlarge, affecting her ability to grip, hold and write for more than five or ten minutes (Tr. 339). She rated the pain in her neck as an "eight" on a scale of 1-10, and a "ten" when the pain was very severe (Tr. 340-341). The Cortisone blocks never completely eliminated the pain and only provided relief for a few days (Tr. 340).

Plaintiff had seen a psychologist, but she stopped therapy when the discussions of her childhood and present situation became too overwhelming for her (Tr. 340). She was still taking Effexor, which provided minimal help, but fewer side effects (Tr. 340-341). However, the medication interfered with her ability to sleep and did not "bring [her] mood up" (Tr. 341). She noticed that she did not have as many crying spells, but was uncertain as

to whether that was the result of the medication or from discontinuing counseling sessions (Tr. 341). The crying spells occurred between three to seven days a week, sometimes happening a few times a day for about 15 minutes each time (Tr. 341-342).

Plaintiff felt like she was in a "fog" if she had to take pain and nausea medication (Tr. 343). She had to take Phenergan for the nausea at least once a week (Tr. 343-344). Although she had problems sleeping, the Phenergan would allow her to sleep for two to three hours (Tr. 344). She would remain awake for two to three days and then sleep for two hours (Tr. 344). She only slept soundly on medication, and it was difficult to rest comfortably in bed (Tr. 344). She had problems concentrating and needed to re-read things in order to remember what she read (Tr. 344).

Plaintiff could usually sit comfortably for five to ten minutes before having to move, get up or walk around, sometimes even needing to lie down (Tr. 345). If she was able to shift positions while sitting, such as moving her legs or getting up to change positions, she could sit 10-15 minutes (Tr. 345). When she had to stand, she needed to lean heavily against a wall or a cart (Tr. 345-346). She could only walk short distances, depending on whether it was a good or bad day (Tr. 346). Plaintiff was only able to walk her dogs in the yard or about 50 feet down the driveway and back before she got tired (Tr. 346).

Plaintiff could not pick up her dogs anymore, being able to lift only five pounds (Tr. 346). Dr. Schell and Dr. Carolyn Scott had restricted her to lifting five to ten pounds when she was still working, however, she continued to lift more than that despite signing a paper agreeing not to (Tr. 346-347). She had difficulty loading and unloading the laundry from the

washer (Tr. 347). She frequently became nauseous while showering (Tr. 348). She only had four to seven good days a month, where a good day meant she could function more than usual, but she might still feel pain (Tr. 348).

Plaintiff had not seen Dr. Schell since September, 1995, because she did not want to undergo the surgery that he had suggested (Tr. 349-350). After the tumor was discovered, she was put on a medication for several years in her 20s that had stopped the tumor's growth (Tr. 350-351). The medication eased some of the symptoms associated with the tumor, including the hormone problems, but certain symptoms continued (Tr. 351).

Plaintiff was involved in a car accident in February, 1994, triggering her neck symptoms (Tr. 351). After describing her symptoms to a doctor at work, she was told that she most likely had neck problems (Tr. 351). Plaintiff went to see Dr. Schell and then Dr. Lingenfalter (Tr. 352). She tried to pursue an insurance claim on the accident and accepted a small settlement in 1997 (Tr. 352).

### 2. Testimony to ALJ Ransom

Attorney Lupisella noted that Plaintiff was amending the onset date to August 15, 1999, based on the emergency room records (Tr. 364-365).

Plaintiff testified as follows:

Plaintiff had not returned to work since the last hearing (Tr. 365). She was still having problems with pain in her neck and shoulders, with pain radiating down to her hand (Tr. 365). She was also still having problems with her hands, reduced strength, memory, concentration,

and sleeping at night (Tr. 365). She had not suffered any real significant change to her overall condition since the last hearing other than going through a divorce (Tr. 366-67). She fell down more often and felt pain all over her back (Tr. 366). Plaintiff walked her dogs once in the morning and once in the evening, for about 15-20 minutes (Tr. 366). She did not walk her dogs longer at night because of her back pain (Tr. 367). She took one or two naps a day for about half hour at a time (Tr. 367). Plaintiff did not have any children and lived alone (Tr. 367). She was 48 years old (Tr. 368). She was not receiving any state aid or benefits and never applied for any (Tr. 368).

She did not think she could return to doing medical records work due to the computer work and heavy lifting involved (Tr. 368). She was still receiving counseling about three to four times a month (Tr. 368). Plaintiff was having a little more difficulty sleeping and had some more pain (Tr. 369). She stopped taking a lot of her pain medication in order to "deal with it on [her] own" (Tr. 369). The pain was worse in her neck, shoulders, and upper back, while her hands were numb (Tr. 366, 369). She was currently taking Fioricet and Altran (Tr. 369). Lying down and taking Fioricet were helpful to relieving migraines, allowing her to sleep (Tr. 369).

### B. Medical Evidence

### 1. Treating Sources

In May 1987, E. Malcolm Field, M.D., noted the appearance of a hypodense lesion in the pituitary, hyper-menorrhea, persistent lactation, and some personality change (Tr. 119). In May 1994, Roberta Bidwell, MSW, observed that Plaintiff had "OK" remote, recent, and

immediate memory, as well as "good" attention/concentration (Tr. 109).  Bidwell diagnosed her with "Adj. Reaction, mixed features" and "Neurotic depression" (Tr. 109).  In March 1995, Bidwell's case closure notes reported that Plaintiff had stopped counseling in February 1995, although she had made 22 visits over the past year (Tr. 108).  Bidwell reported that Plaintiff was very sensitive to manipulative behaviors, easily angered, and "irritated by any perceived pressure upon her" (Tr. 108).  Bidwell also noted that taking a medical leave from work in August 1994 gave Plaintiff some relief and the ability to focus on underlying psychological factors, as well improved emotional management upon return to work (Tr. 108).

In June 1995, Veronica E. Lorenzo, M.D., diagnosed Plaintiff with "left paracentral disk protrusion consistent with disk herniation at the C5/C6 level," but noted that it was of "indeterminate significance" as her symptoms were right-sided in nature (Tr. 145).  In July 1995, Gerald R. Schell, M.D., diagnosed Plaintiff with "a cervical disc with radiculopathy which [had] been aggravated of late," noting the presence of pain radiating into her right arm and significant pain between her shoulders that resulted in headaches (Tr. 118).  Dr. Schell noted that she had similar pains in her left shoulder and arm the previous year, but the symptoms had seemed to ease up (Tr. 118).  Plaintiff also reported numbness of her hands and issues with balance (Tr. 118).  In August 1995, she began intermittent cervical traction in physical therapy with Susan Faber, PTA, who observed that she was "progressing quite well" (Tr. 117).

In September 1995, Gerald R. Schell, M.D., reported that while Plaintiff had a problem with her cervical disc, there was not a neurologic deficit associated with it (Tr. 116).  Imaging

scans taken that same month showed no electromyographic evidence of entrapment neuropathy or cervical radiculopathy (Tr. 113). An examination by Bong Jung, M.D., showed no abnormality in the muscles of the left upper extremity and a negative Tinel's sign in the bilateral medial nerve area at the wrists (Tr. 113). Additional imaging scans showed mild facet hypertrophy at L5-S1, but a normal lumbar spine (Tr. 144). In October 1995, Martha Kramer, PT, reported that Plaintiff's symptoms had generally decreased, although her left arm remained the same (Tr. 114).

In May 1996, imaging scans revealed a slight fullness of the pituitary gland, which the radiologist opined as normal depending on Plaintiff's menstruation cycle (Tr. 143). In June 1996, imaging scans showed the left paracentral disc protrusion to have decreased slightly in prominence, and mild to moderate disc space narrowing consistent with degenerative disc disease at the C5/6 level (Tr. 141-142). In July, September and October 1996, Plaintiff received cervical epidural Depo-Medrol blocks for chronic neck pain secondary to herniated nucleus pulposus, C5-C6 from Richard Lingenfelter, M.D. (Tr. 125, 133, 137). From May 1995, to September 1997, Plaintiff attended therapy with Theresa Shinedling, ACSW, making "good" and "avg to good" progress during most of her visits (Tr. 147-172). In April 1999, Plaintiff visited the emergency room for vomiting and a headache, as well as a persistent flu (Tr. 173). Stephanie Duggan, M.D., noted that she was feeling "100% better" at the end of the visit and ready to go home (Tr. 174).

In March 2001, Caroline Scott, M.D., completed a Medical Report, diagnosing Plaintiff with C5-6 paracental disc, chronic pain syndrome, esophogitis, migraines,

depression, pituitary adenoma, and chest pain (Tr. 176). Dr. Scott reported that she was able to walk on heels and toes, squat, climb stairs and get on and off the examination table (Tr. 177). Dr. Scott also observed that shoulder abduction was normal and there was no loss of grip strength or fine dexterity, noting that Plaintiff was able to open a jar, button her clothes, write legibly, pick up small objects, and hold a pencil with both of her hands (Tr. 178). In addition, Dr. Scott opined that Plaintiff's chronic situational depression caused learned helplessness that limited her activities, interests, and ability to relate to others (Tr. 179). Plaintiff was also suffering from substernal chest discomfort that radiated out and created "sharp" pains, but was not prompted by activity (Tr. 180).

From June 2004 to June 2005, Plaintiff attended therapy with Gerald Maki, MA, CPC, CSW, CAC-1 (Tr. 310-317). Maki diagnosed her with "Adj. Disorder and Dep. Mood," with an initial GAF score of 58[1] (Tr. 317). Plaintiff was observed to have mild to moderate impairments in her functioning over the course of her treatment (Tr. 390-317).

### 2. Consultive and Non-examining Sources

In June 2001, Margaret Cappone, Ph.D., conducted a mental examination of Plaintiff for Disability Determination Services (DDS), concluding that she had Dysthymic Disorder with Adjustment Reaction, Mixed Features Personality Disorder NOS (Tr. 189). Dr. Cappone

---

[1]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school function. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders –Text Revision* at 34 (*DSM-IV-TR*), 30 (4th ed.2000).

gave her a GAF score of 49[2] (Tr. 190). She noted that Plaintiff was preoccupied with her pain and that her "motor activity was somewhat disconnected with some balance problems" (Tr. 187). Dr. Cappone also noted that Plaintiff appeared to have inconsistent attendance and compliance with previous counseling sessions (Tr. 190). In July 2001, a DDS physician completed a Mental RFC assessment, determining that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods of time (Tr. 191). The DDS physician opined that she "[retained] the ability to do simple tasks on a sustained basis" (Tr. 193). Another DDS physician completed a Psychiatric Review Technique the same month and determined that Plaintiff had Dysthymia, Adjustment Disorder and Mixed Personality Disorder NOS, but the impairments did not precisely satisfy the diagnostic criteria (Tr. 198, 202). The DDS physician also concluded that she had "Moderate" difficulties in maintaining social functioning, concentration, persistence, or pace, however, there was insufficient evidence to establish the presence of "C" criteria (Tr. 205-206).

In May 2005, Heidi L. Wale, M.S., LLP, and Ann L. Date, Psy.D., LP, completed a mental examination for DDS, concluding that Plaintiff suffered from Major Depression, Recurrent, Moderate; Post-traumatic Stress Disorder, and P ain Disorder Associated with both Psychological Factors and a General Medical Condition (Tr. 277). Plaintiff was awarded

---

[2]A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders –Text Revision*, 34 (*DSM-IV-TR*) (4th ed.2000).

a GAF score of 50. Wale and Dr. Date also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) and determined that Plaintiff had "Moderate" limitations with understanding and remembering detailed instructions; interacting appropriately with supervisor(s); interacting appropriately with co-workers; responding appropriately to work pressures in a usual work setting; and responding appropriately to changes in a routine work setting, based on recorded Lx (Tr. 278-279).9o

In July 2001, Ken Taylor, D.O., evaluated Plaintiff's physical condition on a Physical RFC Assessment, concluding that she retained the ability to occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk about six hours total in an eight hour workday, sit about six hours total in an eight hour workday, and an unlimited ability of push and/or pull (Tr. 210). Dr. Taylor also determined that Plaintiff's ability to climb ramp/stairs, balance, stoop, kneel, crouch, and crawl was "frequently" limited (Tr. 211). Dr. Taylor noted that the "m/e simply does not appear to support the severe limitations [Plaintiff] alleges" (Tr. 218).

In May 2005, Gavin Awerbuch, M.D., examined Plaintiff, concluding that she had a cervical herniated disc with radiculopathy and persistent spasm; bilateral shoulder derangement left greater than right; suspect impingement syndrome and laxity; chronic depression and anxiety; migraine headaches, cirrhosis, and a history of arthritis (Tr. 283-284). He noted that her cervical range of motion was "quite restricted," and she could not make a complete grip (Tr. 283). Dr. Awerbuch also noted that she had a "positive Spurling test producing pain radiating down both arms," could not raise her arms above 100 degrees and

had a negative Tinel sign (Tr. 283). Dr. Awerbuch opined in his Medical Source Statement of Ability to Do Work-Related Activities (Physical) that Plaintiff was occasionally able to lift and/or carry less than 10 pounds, needed to periodically alternate sitting and standing due to her cervical hernia, and had a moderately limited ability in her upper extremities to push and/or pull (Tr. 285-286). In addition, Dr. Awerbuch determined that she was occasionally able to balance, crouch, stoop reach in all directions, handle, finger, and feel (Tr. Tr. 286-287). Dr. Awerbuch also concluded that Plaintiff's impairment required limitations from noise, dust, vibration, humidity/wetness, hazards, and fumes, odors, chemicals, gases (Tr. 288).

### C.    Vocational Expert Testimony

### 1.  Stephanee Leech

VE Stephanee Leech classified Plaintiff's past relevant work in medical records as light capacity semi-skilled work.

The ALJ then posed the following hypothetical to the VE:

> "If I were to ask you to assume then the person had the ability to perform light work that involved no overhead reaching and no prolonged rotation or repetitive, constantly repetitive, and as I say, no prolonged or constant rotation, flexion, or hyperextension of the neck and no use of vibrating hand tools. And was limited to jobs that required extended periods of instructions, and did not require extended periods of concentration, would such a person be able to perform the claimant's past work, either as she actually performed it, or as she generally performed?"

(Tr. 354-355). The VE found that such an individual would not be able to perform her past relevant work, but retained the residual functional capacity ("RFC") to perform sedentary level work that did not require extended concentration, the ability to remember and carry out

detailed instructions, and moving the neck to look down at a computer for extended periods of time (Tr. 355-57). She stated that Plaintiff could perform such jobs in the local economy as general office clerk (3,000 jobs locally), surveillance system monitor (1,000 jobs locally), dispatcher (1,000 jobs locally), telephone answerer (1,500 job locally), and telephone sales (3,500 jobs locally) (Tr. 356). If a sit-stand option were added to the sedentary level work, the VE stated that the number of office clerk jobs would be reduced to 1,000 jobs locally, although the other jobs would not be affected (Tr. 357). The VE also testified that Plaintiff would be able to perform such light capacity work as general office clerk (1,200 jobs locally), child care attendant (2,800 jobs locally), retail establishment greeter (1,000 jobs locally), and gate security guard (200 jobs locally) (Tr. 357).

     Attorney Andrus posed the following hypothetical to the VE:

> "If an individual had limitations due to pain medications, depression, side effect from medications, and that individual had an inability to sustain sufficient concentration, persistence, or pace for a longer period of time than [90% of the day]...then would that individual be able to perform either their past relevant work or any other work in a sedentary or a light range of work? ...And if an individual had migraine headaches that could be, as testified to, one every ten days or, say, at least two in a month, that rendered the individual unable to, number one, sustain sufficient concentration, persistence or pace throughout an eight hour work day, but would also render them, or cause them the need to be, say, in a closed environment or a dark environment, to try to avoid light sensitivity and prevent nausea and vomiting, would there be work that an individual would be able to perform if that were added onto any of the limitations in the other hypotheticals?"

(Tr. 359-360). The VE testified that missing more than two days a month of work would preclude all employment (Tr. 360).

**2. Timothy Shaner**

VE Timothy Shaner found that an individual with the limitations and impairments that Plaintiff alleged would prevent her from performing any of her past work or any other work (Tr. 370).

The ALJ then posed the following question to the VE:

"Assume for me if you would, that she could perform sedentary work with a maximum lifting of less than ten pounds, a sit/stand option at will, no crawling, squatting, kneeling, climbing, no repetitive pushing, pulling, gripping, or grasping, no air or vibrating tools, no prolonged or repetitive rotation, flection, or extension of her neck and then she would not require close attention to detail, constant close attention to detail, or more than regular pace work and occasional supervision. Assuming those facts, in your opinion would there be jobs in existence in significant numbers in the recent economy that she could perform?"

(Tr. 370-371). The VE stated that given those limitations, Plaintiff would be able to perform unskilled sedentary jobs such as assembler (13,000 jobs locally), information clerk (1,800 jobs locally) and sorter (1,100 jobs locally) (Tr. 371). Under questioning from Attorney Lupsisella, the VE testified that if additional limitations of no frequent handling, fingering, and feeling were added to the previous limitations, the job base would be severely limited. However, a job such as a surveillance system monitor (1,600 jobs locally) would not require any handling, fingering, or feeling (Tr. 371-372). The VE found that work stress added to the occasional fingering, handling, feeling, and reaching limitation would not preclude employment (Tr. 372).

### D. The ALJ's Decision

ALJ Ransom found that Plaintiff was not disabled under the criteria set forth in the Social Security Act (Tr. 19). Plaintiff's major depression, history of headaches and

degenerative disc disease of the cervical spine were severe impairments, but did not individually or in combination equal one of the listings listed in Appendix 1, Subpart P, Regulations No. 4 (Tr. 21).

The ALJ determined that Plaintiff retained the RFC to perform sedentary work lifting only up to 10 pounds in a job that provided for a sit/stand option with no crawling, squatting, kneeling or climbing with no repetitive pushing, pulling, gripping or grasping with no use of air or vibrating tools with all work in a controlled environment, performing simple repetitive tasks with no work that required close attention to detail with a need for only occasional supervision with all work at a regular pace at jobs that are routine and low stress with no prolonged or repetitive rotation, flexion or extension of the neck (Tr. 22). The ALJ found that Plaintiff could not perform any of her past relevant work given her RFC and had not acquired any transferable skills (Tr. 23). The ALJ adopted the VE's job findings and concluded that Plaintiff could find employment as an assembler, information clerk, and sorter (Tr. 23). The ALJ did not find Plaintiff's allegations about her limitations totally credible due to medical evidence contradicting her complaints (Tr. 21-22, 24).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherill v. Secretary of Health and Human Services*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less than a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401,

91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)).  The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight."  *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).  The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A).  In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at

step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984).

## ANALYSIS

### A.   Subsequent Medical Sources

Plaintiff asserts that the ALJ erroneously ignored consultative examinations and medical evidence subsequent to her date last insured (DLI) that provided support for her hand and mental limitations.  She contends that the ALJ mistakenly made no mention of this evidence in his decision, nor provided explanations of how this evidence conflicted with other evidence on the record and why it was not adopted.

According to 42 U.S.C. § 423(a) and (c), a claimant must establish a disability prior to her DLI.  Medical evidence generated after the expiration of a claimant's insured status does not speak to her disability status at the time of the DLI.  *Key v. Callahan*, 109 F.3d 270, 273-274 (6th Cir. 1997).  Such medical evidence provides only "minimally probative" evidence. *See Siterlet v. Sec'y of H.H.S.*, 823 F.2d 918, 920 (6th Cir. 1987).  However, medical evidence subsequent to the DLI may be used by an ALJ in determining whether a degenerative disorder began pre-DLI.  *Quarles v. Barnhart*, 178 F.Supp.2d 1089, 1097 (N.D. Cal. 2001)(where medical evidence was ordered to be taken by the court after the DLI to clarify whether a disability began prior to the DLI when there was limited evidence prior to the DLI).  Medical

reports from a treating physician post-DLI may also be used in conjunction with his medical evidence prior to the DLI as substantial evidence due to their ability to comment on a longitudinal history of a claimant's disorder. *Andresen v. Chater*, 1997 WL 223061 *6-7 (N.D. Ill. 1997).

Plaintiff incorrectly argues that the missing discussions of medical evidence subsequent to the DLI should have been considered by the ALJ. First, all of the missing medical evidence was clearly past the DLI. The ALJ noted that Plaintiff's DLI was December 21, 2002. However, both of the missing consultive sources examined her in 2005, while her social worker treated her from 2004 to 2005. Second, the medical evidence provided by Plaintiff's treating and consultive sources prior to the DLI do not point to the existence of any progressively degenerative disorders related to her wrists or mental condition. For example, Dr. Scott's report showed no signs of arthritis in the hands, noting that she retained normal grip strength and had no loss of fine dexterity in both hands. During an examination by Dr. Jung, Plaintiff's Tinel's sign appeared negative for the bilateral medial nerve area at the wrists. Social Worker Shinedling reported Plaintiff making "good" and "avg to good" progress during counseling sessions. Furthermore, Plaintiff testified at her second hearing that there had been no significant changes to her condition since her first hearing. Lastly, none of the three medical sources examined Plaintiff prior to the DLI and thus had no ability to make a determination of her condition during the relevant period. As the medical evidence subsequent to the DLI had no bearing on her condition prior to the DLI, the ALJ was not required to consider the evidence at all.

Had the ALJ taken the medical evidence subsequent to the DLI under serious consideration, it would have provided negligible support for Plaintiff's claims. Social Worker Maki's notes indicated that she had a GAF of 58 when she first began treatment, noting only moderate difficulties with functioning. Likewise, he rated her ability to function as ranging between "mildly" and "moderately" impaired for a majority of her visits over the course of a year. Although Wale and Dr. Date's examination notes noted the presence of the long-standing symptoms of her mental impairment, their Medical Source Statement of Ability to Do Work-Related Activities (Mental) indicated that Plaintiff only had "slight" to "moderate" restrictions for work-related mental activities. Finally, Dr. Awerbuch's findings regarding the degree of Plaintiff's manipulative limitations were supported only by his observations that she had "much numbness" in her left hand and arm, mild synovitis, and an inability to make a complete grip.

### B. Hypothetical Question

Plaintiff also argues that the ALJ erred by constructing an inaccurate hypothetical question. Pl. Br. at 6. Citing *Varley v. Sec'y of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987), she contends that because the testimony of the vocational expert was based on a hypothetical question missing key pieces of evidence, it should not be used as substantial evidence. She claims that had additional limitations been added to the RFC, the number of jobs in the economy available to her would have been severely limited.

A hypothetical question must precisely and comprehensively set out every physical and mental impairment of the applicant that the ALJ accepts as true and significant. *Varley*, 820

F.2d at 779.  A hypothetical question "should incorporate specific references to job-related restrictions, not the sort of broad limitations the ALJ finds in determining whether a claimant has a severe impairment."  *Bielat v. Comm'r Soc. Sec.*, 267 F.Supp.2d 698, 702 (6th Cir. 2003).  A VE's testimony in response to a  flawed hypothetical question is not substantial evidence and cannot be used to support a finding that jobs in the economy which the Plaintiff can perform are available.  *Edwards v. Barnhart*, 383 F.Supp.2d 920, 931 (6th Cir. 2005).

Plaintiff questions why Dr. Awerbuch's opinion was not used in the formulation of the hypothetical question.  Aside from the issues concerning its relevance to the period prior to Plaintiff's DLI, it appears that the ALJ did not include any discussion of Dr. Awerbuch's evidence concerning manipulative ability because he did not cite the disability due to arthritis in the hands to begin with.  While the ALJ may have erred in leaving out the disability, he cured his error at Step 5 by including limitations in the RFC related to Plaintiff's ability to use her hands and fingers, such as "no repetitive pushing, pulling, gripping, or grasping."  The ALJ's omission of the alleged arthritis disability was rendered harmless as the ALJ included limitations that factored in her arthritis despite his failure to discuss the alleged disability in his decision.

Plaintiff also had a substantial number of jobs available to her had the manipulative limitations been considered.  Although VE Shaner admitted that the addition of manipulative limitations would "severely" limit the job base of the positions he had given earlier in his testimony, he offered the alternative position of surveillance system monitor that required no handling, fingering, or feeling and had 1,600 jobs in the local economy.  The Sixth Circuit

has accepted the existence of 1,350-1,800 jobs in the local economy as a significant number. *See Born v. Sec'y of H.H.S.*, 923 F.2d 1168, 1174 (6th Cir. 1990) (citing *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988)). The existence of 1,600 jobs in the local economy fulfills the requirement of a significant number of positions in the national economy. While the process of formulating the hypothetical question may have been flawed, the hypothetical question itself was not. The question was properly phrased, and the VE's testimony in response constitutes substantial evidence.

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1 (d)(2). Failure to file specific objections constitutes a waiver of any further right to appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct.46, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local* 231, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1 (d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the

opposing party may file a response. The response should not be more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

S/R.  Steven Whalen
R.  STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated:  August 3, 2007

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 3, 2007.

S/Gina Wilson
Judicial Assistant